## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **CINDY A. PEREIRA**, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| **GUARDIAN ANALYTICS, INC., ACTIMIZE INC., AND WEBSTER BANK, NA,** | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Cindy Pereira, individually and on behalf of all similarly situated persons, alleges the following against Guardian Analytics, Inc. ("Guardian"), Actimize Inc. ("Actimize"), and Webster Bank, NA ("Webster") (collectively, the "Defendants") based upon personal knowledge with respect to herself and on information and belief derived from, among other things, investigation by her counsel and review of public documents as to all other matters:

### I.    INTRODUCTION

1.    Plaintiff brings this class action against Defendants for their failure to properly secure and safeguard Plaintiff's and other similarly situated customers' names, Social Security numbers, and financial account numbers (collectively, the "Private Information") from cybercriminal hackers.

1

2.      Guardian is a provider of "behavioral analytics and machine learning solutions for preventing banking fraud and anti-money laundering." Guardian, acquired by Actimize in 2020, is a third-party vendor that provides fraud detection services to Webster.[1]

3.      Webster is a "bank holding company and financial holding company under the BHC Act, incorporated under the laws of Delaware in 1986, and headquartered in Stamford, Connecticut."[2]

4.      On or about April 10, 2023, Webster sent out data breach notice letters to individuals whose information was compromised as a result of "unauthorized third parties access[ing] certain Guardian systems at various times between November 27, 2022 – January 22, 2023" (the "Data Breach").

5.      Plaintiff and "Class Members" (defined below) are now at an imminent and substantial risk of identity theft and various other forms of personal, social, and financial harm as a result of the Data Breach. This risk will remain for their respective lifetimes.

6.      The Private Information compromised in the Data Breach included highly sensitive data that represents a gold mine for data thieves. Now armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, obtaining government benefits, filing fraudulent tax returns, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

---

[1] About Guardian Analytics, NICE Actimize, https://guardiananalytics.com/about-guardian-analytics/ (last visited on Apr. 29, 2023).

[2] Webster Financial Corporation, Annual Report (Form 10-K) (Dec. 31, 2022), available at: https://www.sec.gov/ix?doc=/Archives/edgar/data/801337/000080013723000013/wbs-20221231.htm (last visited on April 29, 2023).

7.     There has been no assurance offered by Defendants that all personal data or copies of data have been recovered or destroyed, or that Defendants have adequately enhanced their data security practices sufficient to avoid a similar breach of its network in the future.

8.     Therefore, Plaintiff and Class Members have suffered and are at an imminent, immediate, and continuing increased risk of suffering ascertainable losses in the form of harm from identity theft and other fraudulent misuse of their Private Information, the loss of the benefit of their bargain with Defendants, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

9.     Plaintiff brings this class action lawsuit to address Defendants' inadequate safeguarding of Class Members' Private Information that they collected and maintained, and their failure to timely detect the Data Breach.

10.     The potential for improper disclosure and theft of Plaintiff's and Class Members' Private Information was a known risk to Defendants, and thus Defendants were on notice that failing to take necessary steps to secure the Private Information left them vulnerable to an attack.

11.     Upon information and belief, Defendants and their employees, agents, vendors, and/or suppliers failed to properly implement adequate data security practices with regard to their computer network and systems that housed the Private Information. Had Defendants properly monitored their networks, they would have discovered the Breach sooner.

12.     Plaintiff's and Class Members' identities are now at risk because of Defendants' negligent conduct as the Private Information that Defendants collected and maintained is now in the hands of data thieves and other unauthorized third parties.

13.    Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose Private Information was accessed and/or compromised during the Data Breach.

14.    Accordingly, Plaintiff, on behalf of herself and the Class, asserts claims for negligence, negligence *per se*, breach of contract, breach of implied contract, violation of Connecticut's Unfair Trade Practices Act, invasion of privacy, unjust enrichment, and declaratory and injunctive relief.

## II.    PARTIES

15.    Plaintiff Cindy Pereira is, and at all times mentioned herein was, a citizen of the State of Connecticut.

16.    Defendant Guardian Analytics, Inc. is a Delaware corporation with its principal place of business at 221 River Street, Hoboken, New Jersey, 07030. Guardian Analytics is a wholly owned subsidiary of Actimize Inc.

17.    Defendant Actimize Inc. is a Delaware corporation with its principal place of business at 221 River Street, Hoboken, New Jersey, 07030.

18.    Defendant Webster Bank, N.A. is a national bank organized under the laws of Delaware with its principal place of business at 200 Elm Street, Stamford, Connecticut 06902.

19.    All of Plaintiff's claims stated herein are asserted against Defendants and any of their owners, predecessors, successors, subsidiaries, agents and/or assigns.

## III.    JURISDICTION AND VENUE

20.    The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many

of whom have different citizenship from Defendants. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

21.    This Court has personal jurisdiction over Defendant Guardian Analytics, Inc. because it operates and is headquartered in this District and conducts substantial business in this District.

22.    This Court has personal jurisdiction over Defendant Actimize Inc. because it operates and is headquartered in this District and conducts substantial business in this District.

23.    This Court has personal jurisdiction over Defendant Webster Bank, N.A. because it contracts with Defendant Guardian, a company headquartered in this District, and purposely availed itself of the laws of New Jersey.

24.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District.

## IV.    FACTUAL ALLEGATIONS

### A.  Defendants' Business and Collection of Plaintiff's and Class Members' Private Information

25.    Guardian Analytics provides "behavioral analytics and machine learning solutions for preventing banking fraud and anti-money laundering."[3]

26.    In its privacy policy, Guardian states the following:

> The privacy and protection of your personal information is important to us. We follow generally accepted industry standards to protect the personal information submitted to us, both during transmission and once we receive it. No method of transmission over the Internet, or method of electronic storage, is 100% secure, however. Therefore, we cannot guarantee its absolute security. . . .

***

---

[3] *See* https://guardiananalytics.com/about-guardian-analytics/ (last visited on April 29, 2023).

We use security software to protect the confidentiality of your personal information. In addition, our business practices are reviewed periodically for compliance with policies and procedures governing the security and confidentiality of our information. Our business practices limit employee access to confidential information, and limit the use and disclosure of such information to authorized persons.[4]

27.     Webster Bank is a "leading commercial bank with more than $70 billion in assets."[5]

28.     Webster's security statement states the following:

Identity theft and fraud can turn your life upside down. We take the privacy and security of your information seriously and our number one goal is to give you peace of mind when it comes to your protection.

\*\*\*

Webster Bank uses enhanced security controls to keep your safety at the top of our list. Learn more about all we do to keep you safe.

29.     Additionally, Webster's Privacy Policy lists the limited business purposes for sharing the Private Information entrusted to it, including "[f]or everyday business purposes," "marketing purposes," "joint marketing with other financial companies," "affiliates' everyday business purposes," and promises to "protect your personal information from unauthorized access and use."[6]

30.     As a prerequisite to receiving services from Webster, Plaintiff and Class Members entrusted Webster with their Private Information and, in doing so, relied upon Webster to keep their Private Information confidential from unauthorized disclosure.

---

[4] *See* https://guardiananalytics.com/privacy-policy/ (last visited on April 29, 2023).

[5] *See* https://public.websteronline.com/sites/default/files/documents/4Q22-company-overview.pdf (last visited on April 29, 2023).

[6] *See* https://public.websteronline.com/security/privacy/privacy-opt-out-notice (last visited on April 29, 2023).

31.     Because of the highly sensitive and personal nature of the information Defendants acquire and store with respect to their customers, Defendants' duties and obligations to Plaintiff and Class Members included, but were not limited to, keeping their Private Information private; complying with industry standards related to data security and the maintenance of their customers' Private Information; informing their customers of their legal duties relating to data security and complying with all federal and state laws protecting customers' Private Information; only using and releasing customers' Private Information for reasons that relate to the services they provide; and providing timely and adequate notice to customers if their Private Information is disclosed without authorization.

32.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure and exfiltration.

33.     Plaintiff and Class Members relied on Defendants to keep their Private Information confidential and securely maintained and to only make authorized disclosures of this information, which Defendants ultimately failed to do.

**B.  The Data Breach**

34.     According to Defendants' Notice sent to Plaintiff and Class Members, unauthorized third parties accessed files that contained Plaintiff's and Class Members' Private Information.

35.     Defendant Webster told the Maine Attorney General that on or around January 26, 2023 it learned that Guardian's system had been impacted by a ransomware incident, and just three days later Webster notified its regulators about the Data Breach.  As to the details of the Data Breach itself, Webster claims that:

    According to Guardian, the investigation determined that at least one

threat actor (the "Threat Actor") gained access to Guardian's environment on November 27, 2022, via a user's Virtual Private Network (VPN) connection to two (2) domain controllers. During the period of unauthorized access to Guardian's network, the Threat Actor obtained credentials to user accounts and leveraged those accounts to perform network reconnaissance, install remote access tools, and encrypt systems. The Threat Actor accessed and obtained files and folders at various times between November 27, 2022 and January 17, 2023. On or around January 14, 2023, the Threat Actor exfiltrated data from a non-production environment at Guardian.

 Beginning on or around January 20, 2023, two Threat Actors threatened Guardian with the release of the Stolen Data. One Threat Actor, associated with the Daixin ransomware group began posting Stolen Data in late January. Later, around February 10, 2023, the Lockbit ransomware gang began posting Stolen Data. Guardian has not offered an explanation on how two Threat Actors came to possess the Stolen Data. Guardian also confirmed they did not pay a ransom.[7]

36.    In that same communication to the Maine Attorney General, Webster confirmed that it found its stolen data on the dark web.  According to the bank:  "Guardian has only provided minimal cooperation and has provided no meaningful help in reviewing and analyzing the exfiltrated data."  On information and belief, Guardian's failure to cooperate delayed Webster's ability to provide notice to Plaintiff and the Class Members about the breach.

37.    Despite knowing about the breach in January 2023, and knowing in February 2023 that the data was available on the dark web, Webster did not provide notice to Plaintiff and any of the Class Members until April 10, 2023, at the earliest, and some class members did not receive notice until after April, 28, 2023.[8]  This is because according to its disclosure to the Maine Attorney General, Webster initially notified 191,563 customers that their data was compromised.[9]  Then on

---

[7] Letter from Norton Rose Fulbright US LLP to Office of Maine Attorney General (April 10, 2023) *available at* (last visited on May 1, 2023).

[8] Office of the Maine Attorney General, Webster Bank Data Breach Notification (April 10, 2023) *available at* https://apps.web.maine.gov/online/aeviewer/ME/40/a42f73e8-720b-41a2-b892-18181e799668.shtml (last visited on May 1, 2023).

[9] *Id.*

April 28, 2023, Webster had to file a supplemental notice that it had found an additional 5,707 customers whose data was stolen, and who were only then receiving notification.[10]

38.     Thus, according to Webster, the data breach affected 197,270 of its customers in total.

39.     Defendants had obligations created by contract, industry standards, common law, federal and state law, and representations made to Plaintiff and Class Members to use reasonable data security procedures and practices to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure. They failed in doing so.

40.     Plaintiff and Class Members provided their Private Information to Defendants with the reasonable expectation and mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access and to provide timely notice of any security breaches.

41.     Defendants' data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

42.     Defendants knew or should have known that their electronic records would be targeted by cybercriminals.

**C.   <u>Defendants Failed to Comply with FTC Guidelines</u>**

43.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and

---

[10] Office of the Maine Attorney General, Webster Bank Data Breach Notification (April 28, 2023) *available at* https://apps.web.maine.gov/online/aeviewer/ME/40/7f2dc403-6290-497a-ae14-a3e00da877f6.shtml (last visited on May 1, 2023).

appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

44.     In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

45.     The FTC further recommends that companies not maintain personally identifiable information ("PII") longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

46.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

47.     As evidenced by the Data Breach, Defendants failed to properly implement basic data security practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

48.     Defendants were at all times fully aware of their obligation to protect the Private Information of their customers yet failed to comply with such obligations. Defendants were also aware of the significant repercussions that would result from their failure to do so.

D.  **Defendants Failed to Comply with Industry Standards**

49.     As noted above, experts studying cybersecurity routinely identify businesses, and especially financial institutions, as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

50.     Some general industry best practices that should be implemented by businesses like Defendants include but are not limited to: educating all employees, using only strong password requirements, implementing multilayer security including firewalls, anti-virus and anti-malware software, using encryption, requiring multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendants failed to follow some or all of these industry best practices.

51.     Other best cybersecurity practices that are standard in the industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendants failed to follow these cybersecurity best practices.

52.     Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

53.     Defendants failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**E.    Defendants Failed to Comply With Federal Law Concerning the Protection of Financial Institution  Customers' Personal Information**

54.     Section 501(b) of the Gramm-Leach-Bliley Act states in relevant part that bank regulators must establish regulations, which banks must comply with, that "insure the security and confidentiality of customer records and information," "protect against any anticipated threats or hazards to the security or integrity of such records," and "protect against unauthorized access to or use of such records or information which could result in substantial harm or inconvenience to any customer."[11]   The regulation's provisions became effective in July 2001 and have steered the discussion of customer information protection in banking ever since.   Nevertheless, as the Data Breach demonstrates, Defendants failed to live up to these cybersecurity obligations.

55.     The Federal Deposit Insurance Corporation ("FDIC") guidance to banks regarding unauthorized access to customer information defines "sensitive customer information" to mean "a customer's name, address or telephone number in conjunction with the customer's Social Security

---

[11] *See also* FDIC Financial Institution Letter FIL-68-2001 *available at* https://www.fdic.gov/news/inactive-financial-institution-letters/2001/fil0168a.html (last visited May 1, 2023).

number, driver's license number, account number, credit or debit card number, or a personal identification number or password that would permit access to the customer's account."[12]

56.    Here Defendant Webster told the Maine Attorney General that the Breach concerned its customers' names, financial account numbers, and in some instances their Social Security numbers.  As such, there is no question that the data involved here is what the FDIC would term sensitive customer information.

57.    The FDIC guidance further requires banks to notify its customers of a data breach "whenever it becomes aware of an incident of unauthorized access to customer information and, at the conclusion of a reasonable investigation, determines that misuse of the information has occurred or it is reasonably possible that misuse will occur."[13]  In interpreting this guidance, banking industry groups recommend that banks provide notice to their customers "as soon as possible."[14]

58.    Webster knew at least by late January or early February that its data was on the dark web, and thus knew that misuse of the stolen information had occurred.  Under those circumstances, it appears clear that Webster delayed too long in notifying its customers when it finally did so in April 2023, and that Defendant Guardian actively frustrated Webster's ability to provide such notice in a timely manner.

---

[12] FIL-27-2005 (April 1., 2005) *available at* https://www.fdic.gov/news/financial-institution-letters/2005/fil2705.html (last visited May 1, 2023).

[13] *Id.*

[14] American Bankers Association, Data Security & Customer Notification Requirements for Banks, *available at* https://www.aba.com/banking-topics/technology/data-security/data-security-customer-notification.

59. In addition, federal regulations require banks to closely oversee security at third party vendors. Given the circumstances of the instant Data Breach it is apparent that Defendant Webster also failed to fulfill this requirement.

**F. Defendants Breached Their Duty to Safeguard Plaintiff's and Class Members' Private Information**

60. In addition to their obligations under federal and state laws, Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiff and Class Members to provide reasonable security, including complying with industry standards and requirements, training for their staff, and ensuring that their (and their vendors' and suppliers') computer systems, networks, and protocols adequately protected the Private Information of Class Members.

61. Defendants breached their obligations to Plaintiff and Class Members and/or were otherwise negligent and reckless because they failed to properly maintain and safeguard their computer systems and data. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

   a. Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

   b. Failing to adequately protect their customers' Private Information;

   c. Failing to properly monitor their own data security systems for existing intrusions and adequately supervise their vendors and/or suppliers;

   d. Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

> e.  Failing to adhere to industry standards for cybersecurity as discussed above; and
>
> f.  Otherwise breaching their duties and obligations to protect Plaintiff's and Class Members' Private Information.

62.  Defendants negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing cyberthieves to access their computer network and systems which contained unsecured and unencrypted Private Information.

63.  Had Defendants remedied the deficiencies in their information storage and security systems (and the maintenance and supervision thereof), followed industry guidelines, and adopted security measures recommended by experts in the field, they could have prevented intrusion into their information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential Private Information.

64.  Accordingly, Plaintiff's and Class Members' lives were severely disrupted by Defendants' acts and omissions alleged herein. What's more, they have been harmed as a result of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft. Plaintiff and Class Members also lost the benefit of the bargain they made with Defendants and the value of their Private Information has diminished in light of its theft.

## G.  Defendants Should Have Known that Cybercriminals Target Private Information to Carry Out Fraud and Identity Theft

65.  The FTC hosted a workshop to discuss "informational injuries," which are injuries that consumers like Plaintiff and Class Members suffer from privacy and security incidents such as data breaches or unauthorized disclosure of data.[15] Exposure of highly sensitive personal

---

[15] *FTC Information Injury Workshop, BE and BCP Staff Perspective,* Federal Trade Commission, (October 2018), *available at* https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf (last visited on April 29, 2023).

information that a consumer wishes to keep private may cause harm to the consumer, such as the ability to obtain or keep employment. Consumers' loss of trust in e-commerce also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

66.     Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data that was breached. Indeed, the reason why criminals steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or to take over victims' identities in order to engage in illegal financial transactions under the victims' names.

67.     Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

68.     In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect." Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

69.     Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' compromised Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiff and Class Members.

70.     For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[16] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

71.     Identity thieves can also use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, bank fraud, to obtain a driver's license or official identification card in the victim's name but with the thief's picture, to obtain government benefits, or to file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house in the victim's name, receive medical services in the victim's name, and even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

72.     PII is data that can be used to detect a specific individual. PII is a valuable property right. Its value is axiomatic, considering the value of big data in corporate America and the

---

[16] *See IdentityTheft.gov,* Federal Trade Commission, *available at* https://www.identitytheft.gov/Steps (last visited April 29, 2023).

consequences of cyber thefts (which include heavy prison sentences). Even this obvious risk-to-reward analysis illustrates beyond doubt that PII has considerable market value.

73.    The U.S. Attorney General stated in 2020 that consumers' sensitive personal information commonly stolen in data breaches "has economic value."[17] The increase in cyberattacks, and attendant risk of future attacks, was widely known and completely foreseeable to the public and to anyone in Defendants' industry.

74.    The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, PII can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[18] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web and that the "*fullz*" (a term criminals who steal credit card information use to refer to a complete set of information on a fraud victim) sold for $30 in 2017.[19]

75.    Likewise, the value of PII is increasingly evident in our digital economy. Many companies including Defendants collect PII for purposes of data analytics and marketing. These companies, collect it to better target customers, and shares it with third parties for similar purposes.

---

[17] *See Attorney General William P. Barr Announces Indictment of Four Members of China's Military for Hacking into Equifax*, U.S. Dep't of Justice, Feb. 10, 2020, available at https://www.justice.gov/opa/speech/attorney-general-william-p-barr-announces-indictment-fourmembers-china-s-military (last visited on April 29, 2023).

[18] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited on April 29, 2023).

[19] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited on April 29, 2023).

76.     One author has noted: "Due, in part, to the use of PII in marketing decisions, commentators are conceptualizing PII as a commodity. Individual data points have concrete value, which can be traded on what is becoming a burgeoning market for PII."[20]

77.     Consumers also recognize the value of their personal information, and offer it in exchange for goods and services. The value of PII can be derived not only by a price at which consumers or hackers actually seek to sell it, but rather in the economic benefit consumers derive from being able to use it and control the use of it.

78.     A consumer's ability to use their PII is encumbered when their identity or credit profile is infected by misuse or fraud. For example, a consumer with false or conflicting information on their credit report may be denied credit. Also, a consumer may be unable to open an electronic account where their email address is already associated with another user.  In this sense, among others, the theft of PII in the Data Breach led to a diminution in value of the PII.

79.     Data breaches, like that at issue here, damage consumers by interfering with their fiscal autonomy. Any past and potential future misuse of Plaintiff's PII impairs her ability to participate in the economic marketplace.

---

[20] *See* John T. Soma, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ('PII') Equals the "Value" of Financial Assets,* 15 Rich. J. L. & Tech. 11, 14 (2009).

80.     A study by the Identity Theft Resource Center[21] shows the multitude of harms caused by fraudulent use of PII:



81.     It must also be noted that there may be a substantial time lag between when harm occurs and when it is discovered, and also between when PII and/or personal financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:[22]

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

---

[21] Steele, Jason, *Credit Card and ID Theft Statistics*, CreditCards.com (October 23, 2017), *available at* https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276/ (last visited April 29, 2023).

[22] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (June 2007), *available at* https://www.gao.gov/assets/270/262904.html (last visited April 29, 2023).

82.     PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black market" for years.

83.     As a result, Plaintiff and Class Members are at substantial increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff and Class Members have no choice but to vigilantly monitor their accounts at a level of monitoring beyond that of an average person, with such monitoring to take place for many years.

**H.  Plaintiff's and Class Members' Damages**

84.     Plaintiff and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

85.     Plaintiff and Class Members entrusted their Private Information to Defendants in order to receive Defendants' services.

86.     Plaintiff's Private Information was subsequently compromised as a direct and proximate result of the Data Breach, which Data Breach resulted from Defendants' inadequate data security practices.

87.     As a direct and proximate result of Defendants' actions and omissions, Plaintiff and Class Members have been harmed and are at an imminent, immediate, and continuing increased risk of harm, including but not limited to, having their financial accounts accessed by unauthorized parties, loans opened in their names, tax returns filed in their names, utility bills opened in their names, credit card accounts opened in their names, and other forms of identity theft.

88.     Further, as a direct and proximate result of Defendants' misconduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach.

89.     Plaintiff and Class Members also face a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of their Private Information,

since potential fraudsters will likely use such Private Information to carry out such targeted schemes against Plaintiff and Class Members.

90. The Private Information maintained by and stolen from Defendants, combined with publicly available information, allows nefarious actors to assemble a detailed mosaic of Plaintiff and Class Members, which can also be used to carry out targeted fraudulent schemes against Plaintiff and Class Members.

91. Plaintiff and Class Members also lost the benefit of the bargain they made with Defendants. Plaintiff and Class Members overpaid for services that were intended to be accompanied by adequate data security but were not. Indeed, part of the price Plaintiff and Class Members paid to Defendants was intended to be used by Defendants to fund adequate security of Defendants' system and protect Plaintiff's and Class Members' Private Information. Thus, Plaintiff and the Class did not receive what they paid for.

92. Additionally, Plaintiff and Class Members have spent and will continue to spend significant amounts of time monitoring their accounts and records for misuse.

93. Finally, Plaintiff and Class Members have suffered or will suffer actual injury as a direct and proximate result of the Data Breach in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach. These losses include, but are not limited to, the following:

> a. Monitoring for and discovering fraudulent charges on their compromised financial accounts;
>
> b. Canceling and reissuing credit and debit cards;
>
> c. Purchasing credit monitoring and identity theft prevention;

    d.   Addressing their inability to withdraw funds linked to compromised accounts;

    e.   Placing "freezes" and "alerts" with credit reporting agencies;

    f.   Spending time on the phone with or at a financial institution to dispute fraudulent charges;

    g.   Contacting financial institutions and closing or modifying financial accounts;

    h.   Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

    i.   Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

    j.   Closely reviewing and monitoring bank accounts and credit reports for additional unauthorized activity for years to come.

94.    Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to still be in the possession of Defendants, is protected from future additional breaches by the implementation of more adequate data security measures and safeguards, including but not limited to, more effective monitoring and supervision of vendors and/or suppliers, ensuring that the storage of data or documents containing personal and financial information is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

95.     As a direct and proximate result of Defendants' actions and inactions, Plaintiff and Class Members have suffered a loss of privacy and have suffered cognizable harm, including an imminent and substantial future risk of harm, in the forms set forth above.

## V.    CLASS ACTION ALLEGATIONS

96.     Plaintiff brings this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

97.     Specifically, Plaintiff proposes the following Nationwide Class, as well as the following State Subclass definitions (also collectively referred to herein as the "Class"), subject to amendment as appropriate:

> **Nationwide Class**
>
> All individuals in the United States who had Private Information stolen as a result of the Data Breach, including all who were sent a notice of the Data Breach.
>
> **Connecticut Subclass**
>
> All residents of Connecticut who had Private Information stolen as a result of the Data Breach, including all who were sent a notice of the Data Breach.

98.     Excluded from the Class are Defendants and their parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

99.     Plaintiff reserves the right to modify or amend the definitions of the proposed Nationwide Class, as well as the Connecticut Subclass, before the Court determines whether certification is appropriate.

100.     The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

101.   <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, based on information and belief, the Class consists of over 197,000 customers whose data was compromised in the Data Breach. The identities of Class Members are ascertainable through Defendants' records, Class Members' records, publication notice, self-identification, and other means.

102.   <u>Commonality</u>. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a.  Whether Defendants engaged in the conduct alleged herein;

    b.  Whether Defendants' conduct violated Connecticut Unfair Trade Practices Act invoked below;

    c.  When Defendants learned of the Data Breach

    d.  Whether Defendants' response to the Data Breach was adequate;

    e.  Whether Defendants unlawfully lost or disclosed Plaintiff's and Class Members' Private Information;

    f.  Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach, including appropriate monitoring and supervision procedures and practices;

    g.  Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

h.  Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

i.  Whether Defendants owed a duty to Class Members to safeguard their Private Information;

j.  Whether Defendants breached their duty to Class Members to safeguard their Private Information;

k.  Whether hackers obtained Class Members' Private Information via the Data Breach;

l.  Whether Defendants had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and the Class Members;

m.  Whether Defendants breached their duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

n.  Whether Defendants knew or should have known that their data security systems and monitoring processes were deficient;

o.  What damages Plaintiff and Class Members suffered as a result of Defendants' misconduct;

p.  Whether Defendants' conduct was negligent;

q.  Whether Defendants' conduct was *per se* negligent;

r.  Whether Defendants were unjustly enriched;

s.  Whether Plaintiff and Class Members are entitled to actual and/or statutory damages;

t.  Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

u. Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

103. <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach.

104. <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

105. <u>Predominance</u>. Defendants have engaged in a common course of conduct toward Plaintiff and Class Members in that all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

106. <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for

Defendants. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

107.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). Defendants have acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

108.    Finally, all members of the proposed Class are readily ascertainable. Defendants have access to the names and addresses and/or email addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendants.

## VI.    CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and the Nationwide Class or Alternatively the Connecticut Subclass)

109.    Plaintiff restates and realleges the allegations in paragraphs 1-108 as if fully set forth herein.

110.    Defendants knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

111.    Defendants knew or should have known of the risks inherent in collecting the Private Information of Plaintiff and Class Members and the importance of adequate security. Defendants were on notice because, on information and belief, they knew or should have known that they would be an attractive target for cyberattacks.

28

112.    Defendants owed a duty of care to Plaintiff and Class Members whose Private Information was entrusted to it. Defendants' duties included, but were not limited to, the following:

    a.  To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

    b.  To protect their customers' Private Information using reasonable and adequate security procedures and systems compliant with industry standards;

    c.  To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in their possession;

    d.  To employ reasonable security measures and otherwise protect the Private Information of Plaintiff and Class Members pursuant to the FTCA and Connecticut's Unfair Trade Practices Act;

    e.  To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

    f.  To promptly notify Plaintiff and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

113.    Defendants' duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

114.    Defendants' duty also arose because Defendants were bound by industry standards to protect their customers' confidential Private Information.

115.    Plaintiff and Class Members were foreseeable victims of any inadequate security practices on the part of Defendants, and Defendants owed them a duty of care to not subject them to an unreasonable risk of harm.

116.    Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' Private Information within Defendants' possession.

117.    Defendants, by their actions and/or omissions, breached their duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiff and Class Members.

118.    Defendants, by their actions and/or omissions, breached their duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

119.    Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

    a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

    b.    Failing to adequately monitor the security of their networks and systems (and/or those of their vendors and/or suppliers);

    c.    Allowing unauthorized access to Class Members' Private Information;

    d.    Failing to comply with the FTCA; and

    e.    Failing to detect in a timely manner that Class Members' Private Information had been compromised.

120.    Defendants had a special relationship with Plaintiff and Class Members. Plaintiff's and Class Members' willingness to entrust Defendants with their Private Information was predicated on the understanding that Defendants would take adequate security precautions. Moreover, only Defendants had the ability to adequately monitor, supervise, and protect their systems (and the Private Information that they stored on them) from attack.

121.    Defendants' breach of duties owed to Plaintiff and Class Members caused Plaintiff's and Class Members' Private Information to be compromised and exfiltrated, as alleged herein.

122.    Defendants' breaches of duty also caused a substantial, imminent risk to Plaintiff and Class Members of identity theft, loss of control over their Private Information, and/or loss of time and money to monitor their accounts for fraud.

123.    As a result of Defendants' negligence in breach of their duties owed to Plaintiff and Class Members, Plaintiff and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

124.    Defendants also had independent duties under state laws that required them to reasonably safeguard Plaintiff's and Class Members' Private Information and promptly notify them about the Data Breach.

125.    As a direct and proximate result of Defendants' negligent conduct, Plaintiff and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

126.    The injury and harm that Plaintiff and Class Members suffered was reasonably foreseeable.

127.    Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

128.    In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *inter alia*, strengthen their data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

## COUNT II
## NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and the Nationwide Class or
### Alternatively the Connecticut Subclass)

129.    Plaintiff restates and realleges the allegations in paragraphs 1-108 as if fully set forth herein.

130.    Pursuant to Section 5 of the FTCA, Defendants had a duty to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiff and Class Members.

131.    Defendants breached their duties by failing to employ industry-standard cybersecurity measures in order to comply with the FTCA, including but not limited to: proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

132.    Plaintiff and Class Members are within the class of persons that the FTCA is intended to protect.

133.    The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect PII (such as the Private Information compromised in the Data Breach). The FTC rulings and publications described above and the industry-standard cybersecurity measures also set forth above form part of the basis of Defendants' duty in this regard.

134.    Defendants violated the FTCA by failing to use reasonable measures to protect the Private Information of Plaintiff and the Class and by not complying with applicable industry standards, as described herein.

135.    It was reasonably foreseeable, particularly given the growing number of data breaches of Private Information, that the failure to reasonably protect and secure Plaintiff's and Class Members' Private Information in compliance with applicable laws would result in an unauthorized third-party gaining access to Defendants' networks, databases, and computers that stored Plaintiff's and Class Members' unencrypted Private Information.

136.    Defendants' violations of the FTCA constitute negligence *per se*.

137.    Plaintiff's and Class Members' Private Information constitutes personal property that was stolen due to Defendants' negligence, resulting in harm, injury, and damages to Plaintiff and Class Members.

138.    As a direct and proximate result of Defendants' negligence *per se*, Plaintiff and the Class have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information , including but not limited to damages from the actual misuse of their Private Information and the lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives.

139.    Defendants breached their duties to Plaintiff and the Class under the FTCA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

140.    As a direct and proximate result of Defendants' negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

141.    In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *inter alia*, strengthen their data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

### COUNT III
### BREACH OF CONTRACT (AGAINST WEBSTER BANK)
### (On behalf of Plaintiff and the Nationwide Class or Alternatively the Connecticut Subclass)

142.    Plaintiff restates and realleges the allegations in paragraphs 1-108 as if fully set forth herein.

143.    Plaintiff and Class Members entered into a valid and enforceable contract through which they paid money and gave their Private Information to Webster in exchange for services. That contract included promises by Webster, including those made in its Privacy Policy, to secure, safeguard, and not disclose Plaintiff's and Class Members' Private Information.

144.    Webster's Privacy Policy memorialized the rights and obligations of Webster Bank and its customers. This document was provided to Plaintiff and Class Members in a manner in which it became part of the agreement for services.

145.    In the Privacy Policy, Webster commits to protecting the privacy and security of private information and promises to never share Plaintiff's and Class Members' Private Information except under certain limited business circumstances.

146.    Plaintiff and Class Members fully performed their obligations under their contracts with Webster.

147.    However, Webster did not secure, safeguard, and/or keep private Plaintiff's and Class Members' Private Information from unauthorized disclosure, as promised in the Privacy Policy, and therefore Webster breached its contract with Plaintiff and Class Members.

148.    Webster allowed third parties to access, copy, and/or exfiltrate Plaintiff's and Class Members' Private Information without permission. Therefore, Webster breached the Privacy Policy with Plaintiff and Class Members.

149.    Webster's failure to satisfy its confidentiality and privacy obligations resulted in Webster's providing services to Plaintiff and Class Members that were of a diminished value.

150.    As a result, Plaintiff and Class Members have been harmed, damaged, and/or injured as described herein, including in Webster's failure to fully perform its part of the bargain with Plaintiff and Class Members.

151.    As a direct and proximate result of Webster's conduct, Plaintiff and Class Members suffered and will continue to suffer damages in an amount to be proven at trial.

152.    In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Webster to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

## COUNT IV
### BREACH OF IMPLIED CONTRACT (AGAINST WEBSTER BANK)
#### (On Behalf of Plaintiff and the Nationwide Class or Alternatively the Connecticut Subclass)

153.    Plaintiff restates and realleges the allegations in paragraphs 1-108 as if fully set forth herein.

154.    This Count is pleaded in the alternative to Count III above.

155.    In connection with the dealings Plaintiff and Class members had with Defendants, Plaintiff and Class members entered into implied contracts with Webster.

156.    Pursuant to these implied contracts, Webster agreed to provide services to Plaintiff and Class Members. Plaintiff and Class Members formed an implied contract with Webster

regarding the provision of those services through their collective conduct, including by Plaintiff and Class Members giving their Private Information to Webster.

157.    Through Webster's provision of services to Plaintiff and Class Members, it knew or should have known that it must protect Plaintiff's and Class Members' confidential Private Information in accordance with its own policies, practices, and applicable law.

158.    As consideration, Plaintiff and Class Members turned over valuable Private Information to Webster. Accordingly, Plaintiff and Class Members bargained with Webster to securely maintain and store their Private Information.

159.    Webster accepted possession of Plaintiff's and Class Members' Private Information for the purpose of providing services to Plaintiff and Class Members and using such Private Information for business purposes.

160.    In delivering their Private Information to Webster, Plaintiff and Class Members intended and understood that Webster would adequately safeguard the Private Information as part of that service.

161.    Webster's implied promises to Plaintiff and Class Members include, but are not limited to, (1) taking steps to ensure that anyone who is granted access to Private Information, including its vendors, also protect the confidentiality of that data; (2) taking steps to ensure that the Private Information that is placed in the control of its employees and vendors is restricted and limited to achieve an authorized business purpose; (3) restricting access to qualified and trained employees and/or vendors; (4) designing and implementing appropriate retention policies to protect the Private Information against criminal data breaches; (5) applying or requiring proper encryption; (6) implementing multifactor authentication for access; and (7) taking other steps to protect against foreseeable data breaches.

162.    Plaintiff and Class Members would not have entrusted their Private Information to Webster in the absence of such an implied contract.

163.    Had Webster disclosed to Plaintiff and the Class that it did not have adequate computer systems and security practices to secure their sensitive data, Plaintiff and Class Members would not have provided their Private Information to Webster and would have banked elsewhere.

164.    Webster recognized that Plaintiff's and Class Member's Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiff and Class Members.

165.    Webster violated these implied contracts by failing to employ reasonable and adequate security measures to secure Plaintiff's and Class Members' Private Information.

166.    Plaintiff and Class Members have been damaged by Webster's conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein.

**COUNT V**
**VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT, CONN.**
**GEN. STAT. §§ 42-110A, *ET SEQ.* ("CUTPA")**
**(On Behalf of Plaintiff and the Connecticut Subclass)**

167.    Plaintiff restates and realleges the allegations in paragraphs 1-108 as if fully set forth herein.

168.    CUTPA states, "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen Stat. § 42-110b.

169.    Plaintiff, Class Members, and Defendants are "persons" under CUTPA. Conn. Gen Stat. § 42-110a.

170.    The services that Defendants provide are "trade" and "commerce" pursuant to CUTPA. Conn. Gen Stat. § 42-110a.

171.    Webster made representations to Plaintiff and Class Members that their Private Information will remain private, as evidenced by, *inter alia*, its representations in its Privacy Policy on its website. Webster committed deceptive acts in violation of CUTPA by failing to inform Plaintiff and Class Members that it would not adequately secure Plaintiff's and Class Members' Private Information by contracting with parties that did not have adequate safeguards in place to protect PII.

172.    All Defendants engaged in unfair acts in violation of CUTPA by failing to implement and maintain reasonable security measures to protect and secure Plaintiff's and Class Members' Private Information in a manner that complied with applicable laws, regulations, and industry standards. The failure to implement and maintain reasonable data security measures offends established public policy, is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

173.    Due to the Data Breach, Plaintiff and Class Members have lost property in the form of their Private Information. Further, Defendants' failure to adopt reasonable practices in protecting and safeguarding their customers' Private Information will force Plaintiff and Class Members to spend time or money to protect against identity theft. Plaintiff and Class Members are now at a higher risk of identity theft and other crimes. This harm sufficiently outweighs any justifications or motives for Defendants' practice of collecting and storing Private Information without appropriate and reasonable safeguards to protect such information.

174.    Plaintiff and all other Class Members were damaged by Defendants' violation of CUTPA because: (i) they paid for data security protection they did not receive; (ii) they face a substantially increased and imminent risk of identity theft—a risk justifying or necessitating expenditures for protective and remedial services for which they are entitled to compensation; (iii)

their Private Information was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their Private Information has been breached; (v) they were deprived of the value of their Private Information, for which there is a well-established national and international market; (vi) they lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vii) they overpaid for the services that were received without adequate data security.

## COUNT VI
## INVASION OF PRIVACY
### (On Behalf of Plaintiff and the Nationwide Class or Alternatively the Connecticut Subclass)

175.    Plaintiff restates and realleges the allegations in paragraphs 1-108 as if fully set forth herein.

176.    Plaintiff and Class Members maintain a privacy interest in their Private Information, which is private, confidential information that is also protected from disclosure by applicable laws set forth above.

177.    Plaintiff and Class Members' Private Information was contained, stored, and managed electronically in Defendants' records, computers, and databases and was intended to be secured from unauthorized access to third-parties because highly sensitive, confidential matters regarding Plaintiff's and Class Members' identities were only shared with Defendants for the limited purpose of obtaining and paying for Defendants' services.

178.    Additionally, Plaintiff's and Class Members' Private Information is highly attractive to criminals who can nefariously use such Private Information for fraud, identity theft, and other crimes without the victims' knowledge and consent.

179.    Defendants owed a duty to Plaintiff and the Class to keep their Private Information confidential. Defendants failed to protect and, instead, released to unknown and unauthorized third parties the non-redacted and non-encrypted Private Information of Plaintiff and the Class.

180.    Defendants allowed unauthorized and unknown third parties access to and examination of the Private Information of Plaintiffs and the Class by way of Defendants' failure to protect the Private Information.

181.    Defendants' disclosure of Plaintiff's and Class Members' Private Information to unauthorized third parties as a result of its failure to adequately secure and safeguard their Private Information is highly offensive to the reasonable person. Defendants' disclosure of Plaintiff's and Class Members' Private Information to unauthorized third parties permitted the physical and electronic intrusion into private quarters where Plaintiff's and Class Members' Private Information was stored.

182.    The intrusion was into a place or thing which was private and is entitled to be private. Plaintiff and the Class disclosed their Private Information to Webster as part of Plaintiffs' their banking relationships with Webster, but privately and with the intention that the Private Information would be kept confidential and would be protected from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

183.    Defendants acted with a knowing state of mind when they permitted the Data Breach to occur because it was with actual knowledge that their information security practices were inadequate and insufficient.

184.    Plaintiff and Class Members have been damaged by Defendants' conduct, including by incurring the harms and injuries arising from the Data Breach now and in the future.

**COUNT VII**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Nationwide Class or Alternatively the Connecticut Subclass)**

185.    Plaintiff restates and realleges the allegations in paragraphs 1-108 as if fully set forth herein.

186.    This Count is pleaded in the alternative to Counts III and IV above.

187.    Plaintiff and Class Members conferred a benefit on Defendants by turning over their Private Information to Defendants and by paying for services that should have included cybersecurity protection to protect their Private Information. Plaintiff and Class Members did not receive such protection.

188.    Upon information and belief, the monies paid by Plaintiff and the Class to Webster were used by Webster, in part, to pay Guardian and Actimize.

189.    Defendants accepted or had knowledge of the benefits conferred upon them by Plaintiff and Class Members. Defendants also benefitted from the receipt of Plaintiffs' and Class Members' Private Information, as this was used in providing banking, marketing, and other services.

190.    Defendants have retained the benefits of its unlawful conduct, including the amounts of payment received from Plaintiff and Class Members that should have been used for adequate cybersecurity practices that they failed to provide.

191.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and or are at an impending and substantial risk of suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs

associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

192.    Additionally, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures, and those payments without reasonable data privacy and security practices and procedures that they received.

193.    Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

194.    Plaintiff and Class Members may not have an adequate remedy at law against Defendants, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT VIII**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiff and the Nationwide Class or Alternatively the Connecticut Subclass)**

195.    Plaintiff restates and realleges the allegations in paragraphs 1-108 as if fully set forth herein.

196.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal and state laws and regulations described in this Complaint.

197.    Defendants owe a duty of care to Plaintiff and Class Members, which required them to adequately secure Plaintiff's and Class Members' Private Information.

198.    Defendants still possess Private Information regarding Plaintiff and Class Members.

199.    Plaintiff alleges that Defendants' data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of her Private Information and the risk remains that further compromises of her Private Information will occur in the future.

200.    Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

   a.   Defendants owe a legal duty to secure their customers' Private Information and to timely notify customers of a data breach under the common law and Section 5 of the FTCA;

   b.   Defendants' existing security measures do not comply with their explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect customers' Private Information; and

c.   Defendants continue to breach this legal duty by failing to employ reasonable measures to secure customers' Private Information.

201.   This Court should also issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with legal and industry standards to protect customers' Private Information, including the following:

a.   Order Defendants to provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

b.   Order that, to comply with Defendants' explicit or implicit contractual obligations and duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to:

  i.    engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

  ii.   engaging third-party security auditors and internal personnel to run automated security monitoring;

  iii.  auditing, testing, and training its security personnel regarding any new or modified procedures;

  iv.   segmenting their user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendants' systems;

  v.    conducting regular database scanning and security checks;

44

vi.    routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

vii.    meaningfully educating their users about the threats they face with regard to the security of their Private Information, as well as the steps Defendants' customers should take to protect themselves.

202.    If an injunction is not issued, Plaintiff will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach within Defendants' systems and networks. The risk of another such breach is real, immediate, and substantial. If another breach occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

203.    The hardship to Plaintiff if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Plaintiff will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of Defendants' compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

204.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach within Defendants' networks and systems, thus preventing future injury to Plaintiff and other customers whose Private Information would be further compromised.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Classes described above, seeks the following relief:

    a.  An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is a proper representative of the Nationwide Class and Connecticut Subclass requested herein;

    b.  Judgment in favor of Plaintiff and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

    c.  An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

    d.  An order instructing Defendants to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members;

    e.  An order requiring Defendants to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

    f.  A judgment in favor of Plaintiff and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

    g.  An award of such other and further relief as this Court may deem just and proper.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all triable issues.

DATED:  May 3, 2023                     Respectfully submitted,


                                        */s/ Steven D. Cohen*
                                        Steven D. Cohen (038172009)
                                        Mason A. Barney (to be admitted *pro hac vice*)
                                        Tyler Bean (to be admitted *pro hac vice*)
                                        **SIRI & GLIMSTAD LLP**
                                        745 Fifth Avenue, Suite 500
                                        New York, New York 10151
                                        Tel: (212) 532-1091
                                        E: scohen@sirillp.com
                                        E: mbarney@sirillp.com
                                        E: tbean@sirillp.com